J-S21006-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JULIA ANN CALIPO | : | |
| | : | |
| Appellant | : | No. 1929 WDA 2016 |

Appeal from the Judgment of Sentence November 3, 2016
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0000990-2016

BEFORE:  OLSON, J., MURRAY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OLSON, J.:                    FILED MAY 31, 2018

Appellant, Julia Ann Calipo, appeals, pro se,[1] from the judgment of sentence entered on November 3, 2016 in the Criminal Division of the Court of Common Pleas of Erie County.  We affirm.

Appellant's conviction in this case arose from an intentional fire that destroyed her residence at 235 East 32nd Street in Erie, Pennsylvania on February 18, 2015 and a related insurance claim that Appellant submitted to Allstate Insurance Company (Allstate) for loss of dwelling and contents.  Prior to these events, Appellant and her children resided at the East 32nd Street residence when a fire damaged the structure in October 2011.  At this time,

_____

[1] The record reflects that following a November 3, 2017 hearing pursuant to Commonwealth v. Grazier, 713 A.2d 81 (Pa. 1998) (requiring on-the-record determination of whether waiver of right to appellate counsel is knowing, intelligent, and voluntary), the trial court granted Appellant's request to proceed pro se.

Appellant collected insurance proceeds from Farmers Insurance for losses incurred in the 2011 fire. After the 2011 fire, Appellant and her children relocated to another home but returned to the East 32nd Street residence in July 2014. Approximately four months later, on November 20, 2014, Appellant applied to Allstate for homeowners' insurance coverage. Based upon information provided by Appellant, Allstate issued a policy that became effective on December 3, 2014.

Allstate commissioned a home inspection that was scheduled for December 1, 2014. The inspection revealed material misrepresentations by Appellant regarding the condition of the property and the age of improvements to the structure. Based upon the findings of the inspection, Allstate cancelled its policy on the residence effective February 26, 2015.

On February 18, 2015, eight days before the scheduled termination of Appellant's homeowners' coverage, a fire broke out at the East 32nd Street residence. The evidence at trial showed that Appellant, and possibly an adult child, were the only individuals who had keys or access to the premises and that Appellant was the last person to leave the residence that evening. Allstate hired a private investigator, Robert Rice, to determine the cause of the fire. Rice determined that the fire was set intentionally and that it was caused by the ignition of a stove that contained an aerosol can and clothing. Guy Santone, Fire Chief for the City of Erie Fire Department, also investigated the fire and agreed with Rice that the fire at the East 32nd Street residence was set intentionally.

Appellant submitted an insurance claim to Allstate on February 18, 2015. The claim was referred to Allstate's Special Investigative Unit given its suspicious circumstances, including the 2011 fire and the fact that the fire occurred while Appellant's homeowners' policy was in cancellation status. While the investigation was ongoing, Allstate paid certain sums to Appellant. On November 17, 2015, however, Allstate denied coverage for Appellant's claimed losses due to Appellant's failure to cooperate, misrepresentations in Appellant's list of contents and her statement under oath, and Allstate's determination that the fire was set intentionally.

The Commonwealth filed an amended criminal information on September 13, 2016 charging Appellant with arson - endangering persons (18 Pa.C.S.A. § 3301(a)(1)(i)), arson - endangering property (18 Pa.C.S.A. § 3301(c)(3)), risking catastrophe (18 Pa.C.S.A. § 3302(b)), three counts of recklessly endangering another person (18 Pa.C.S.A. § 2705), and two counts of insurance fraud (18 Pa.C.S.A. § 4117(a)(2) and (b)(4)). Following a three-day trial that concluded on September 21, 2016, a jury found Appellant guilty of all charges.[2] On November 3, 2016, Appellant received an aggregate sentence of 20 to 40 months' incarceration, followed by seven years' state probation.

---

[2] Without notifying the court or her attorney, Appellant failed to appear on the third day of trial. Despite Appellant's absence, trial proceeded over the objection of counsel.

On November 10, 2016, Appellant moved for post-sentence relief, which the court denied on November 28, 2016. A timely notice of appeal followed on December 20, 2016. Pursuant to Pa.R.A.P. 1925(b), the trial court directed Appellant to file and serve a concise statement of errors complained of on appeal. Appellant timely complied on January 6, 2017. The trial court issued its Rule 1925(a) opinion on April 13, 2017.

In her brief to this Court, Appellant lists 25 issues for our review. See Appellant's Brief at 7-9. Many of Appellant's claims were not included within her January 6, 2017 concise statement, others are repetitive, several assert the ineffectiveness of trial counsel, and still others incoherently allege corruption and misconduct on the part of the trial judge and prosecuting attorneys. For these reasons, we have confined our review of this appeal to the issues addressed in the trial court's April 13, 2013 opinion.

After careful review of the parties' submissions, the opinion of the trial court, the certified record, and pertinent case law, we conclude that Appellant is not entitled to relief. Moreover, in light of our determination that the trial court's opinion adequately and accurately addresses the issues that were properly raised and preserved in this appeal, we adopt the court's April 13, 2017 opinion as our own. The parties are directed to attach a copy of the court's opinion to all future filings that relate to our disposition in this appeal.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  5/31/2018

COMMONWEALTH OF PENNSYLVANIA     :    IN THE COURT OF COMMON PLEAS

                                      :    OF ERIE COUNTY, PENNSYLVANIA

               v.                 :    CRIMINAL DIVISION

JULIA ANN CALIPO, DEFENDANT      :    NO. 990 of 2016

## OPINION

This matter is before the Court on Appellant's, Julia Ann Calipo's, 1925(b) Concise Statement of Matters Complained of on Appeal. For the reasons set forth below, the judgment of sentence must be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant's convictions stem from the application for homeowner's insurance on Appellant's residence at 235 East 32nd Street, Erie, Pennsylvania, in November of 2014; the intentionally set fire at the residence on February 18, 2015; and the insurance claim Appellant submitted to Allstate Insurance Company for loss of dwelling and contents due to the fire.

Previously, in October of 2011, a house fire occurred at the residence. Appellant collected insurance proceeds from Farmer's Insurance for losses she claimed from the 2011 fire.

After the 2011 fire, Appellant and her children moved to another residence which Appellant owned, located on Liberty Street in Erie. In July, 2014, Appellant and the children returned to the residence at 235 East 32nd Street. The move back to 235 East 32nd Street was only intended to be temporary, as Appellant wanted to relocate to Florida.

Approximately four months later, on November 20, 2014, Appellant applied to Allstate Insurance Company for homeowner's insurance on the residence at 235 East 32nd Street. Based

APR 17 2017

1



COMMONWEALTH'S EXHIBIT A

upon information supplied by Appellant, Allstate bound over a policy of homeowner's insurance to become effective on December 3, 2014.

In underwriting the policy, Allstate contracted with Mueller Insurance Services to conduct a home inspection. The home inspection occurred on December 1, 2014. The home inspection revealed, *inter alia*, material misrepresentations Appellant made to Allstate regarding the condition of the property and the age of improvements to the property. Based upon the findings of the home inspection, Allstate cancelled the insurance on the residence effective February 26, 2015. Allstate removed Appellant from the easy payment plan whereby the monthly insurance premiums were to be automatically debited from Appellant's checking account. After this occurred, Appellant on her own initiative paid the homeowner's insurance premiums through the effective date of cancellation.

On February 18, 2015, eight days before the homeowner's insurance coverage on the residence at 235 East 32nd Street was to terminate, an early evening fire broke out at the residence which rapidly consumed the house and contents. Appellant and possibly an adult child were the only persons who had keys or access to the residence. Appellant was the last person to leave the residence that evening. Appellant estimated she left the residence approximately one hour before the fire, when a mobile therapist left the residence. The mobile therapist testified he left the residence at 5:20 p.m. that evening. When Appellant left, she locked the door behind her.

The fire was discovered by a neighbor, Jacob Vallimont, who spotted a small flame through a large window at the back of Appellant's residence, in the kitchen area. The flame grew quickly and the residence caught on fire. Vallimont immediately called 911. As he spoke with the 911 operator, the house became engulfed in flames.

2

The City of Erie Fire Department was the first responder on the scene, arriving within minutes of dispatch. Also responding and assisting were Emergycare paramedics, City of Erie Police, Penelec Electric Company and National Fuel Gas. Despite the prompt response by the fire department, the nature of the fire was such that the residence could not be saved.

The fire placed neighboring residences, neighbors and responding personnel at risk of serious harm. It was frigid and snowing; temperatures were falling; there was an accumulation of snow on the ground; and it was icy. These conditions presented safety hazards and difficulties in accessing the residence with vehicles, equipment and personnel. The fire grew exceptionally fast. Extreme heat from the fire threatened responding personnel and neighboring structures. The firefighters were at risk of hypothermia. A partial building collapse of Appellant's residence placed responders at further risk of harm. An electrical power line to the structure fell on a fire rig. It took responding personnel an exceptionally long time, over one hour, to get control of the fire. The last fire crews left at approximately 10:00 p.m., but returned to the residence periodically throughout the night to extinguish hot spots that erupted.

The next day, the residence was razed because it was structurally unsafe. Guy Santone, Fire Chief, investigated the fire. Santone determined the fire originated in the southwest corner of the residence, the area of heaviest damage.

Allstate Insurance hired a private investigator, Robert Rice, of Maltase Fire Investigations, to investigate the cause of the fire. During his investigation, Rice uncovered an oven from beneath the rubble of Appellant's residence. The glass in the oven door was ruptured. Inside the oven, an aerosol can was found jammed beneath an oven rack. Material, like clothing material, was found next to the can inside the oven. Rice concluded the aerosol can and the clothing were deliberately placed inside the oven. Rice ultimately concluded the fire originated

3

inside the stove in the kitchen, and the cause of the fire was human interaction by placing an aerosol can and clothing, inside of the stove and turning on the stove.

Santone determined the cause of the 2015 fire was aerosol – incendiary. Santone concurred with Rice the fire was intentionally set.

On February 18, 2015, Appellant submitted to Allstate a claim for the loss of the dwelling and its contents. The claim was assigned to Allstate's Special Investigative Unit due to the suspicious circumstances, including the 2011 fire and the fact this fire occurred while the policy was in cancellation status.

While the investigation was ongoing, Allstate paid Appellant approximately $11,000.00 toward loss of contents, plus approximately $20,000.00 for living expenses. Appellant submitted to Allstate a two-page list of the contents of the house. During Appellant's Examination Under Oath on April 17, 2015, Appellant testified to the contents of the house on February 18, 2015. Though the two-page list was not a complete listing of contents, Appellant failed to supplement the list or provide a complete list of contents to support the claim.

On November 17, 2015, Allstate denied coverage for the claimed losses, due to Appellant's failure to cooperate, misrepresentation of material facts in the partial contents list and/or Appellant's Examination Under Oath, and Allstate's belief the fire was intentionally set.

Pursuant to the Amended Criminal Information filed September 13, 2016, Appellant was charged with Arson and Related Offenses[1]; Arson and Related Offenses, Arson Endangering

---

[1] 18 Pa.C.S.A. §3301(a)(1)(i).

Property[2]; Risking Catastrophe[3]; three counts of Recklessly Endangering Another Person[4]; and two counts of Insurance Fraud[5].

On September 21, 2016, following the three-day jury trial, Appellant was convicted of all charges. On September 21, 2016, the third day of trial, Appellant failed to appear. Appellant had previously been released on her own recognizance, and did not notify the Court or her attorney she was not going to appear on the third day of trial. The trial continued *in absentia* over the objection of Appellant's counsel.

On November 3, 2016, Appellant was sentenced to an aggregate of 20 months to 40 months of incarceration, followed by seven years' of state-supervised probation, as follows:

> Count One: Arson and Related Offenses - 12 to 24 months of incarceration followed by three years of state supervised probation.
>
> Count Two: Arson and Related Offenses, Arson Endangering Property – Three months to six months of incarceration, consecutive to Count One.
>
> Count Three: Risking Catastrophe – (Merged with Count Two).
>
> Count Four: Recklessly Endangering Another Person – One month to two months of incarceration, followed by one year of state-supervised probation, consecutive to Count Two.
>
> Count Five: Recklessly Endangering Another Person – (Merged).
>
> Count Six: Recklessly Endangering Another Person – (Merged).
>
> Count Seven: Insurance Fraud (statement) – Three months to six months of incarceration, followed by two years of state-supervised probation, consecutive to Count Four.
>
> Count Eight: Insurance Fraud (application) – One month to two months of incarceration, followed by one year of state-supervised probation, consecutive to Count Seven.

---

[2] 18 Pa.C.S.A. §3301(c)(3).
[3] 18 Pa.C.S.A. §3302(b).
[4] 18 Pa.C.S.A. §2705 (three counts).
[5] 18 Pa.C.S.A. §§4117(a)(2) and 4117(b)(4), respectively.

A Motion for Post-Sentence Relief was filed on November 10, 2016. On November 28, 2016, the Court denied the motion. A Notice of Appeal was timely filed on December 20, 2016. On December 30, 2016, the court issued a 1925(b) Order. On January 6, 2017, Appellant filed a Statement of Matters Complained of On Appeal.

Condensed and re-ordered for clarity, Appellant raises the following issues for appellate review:

1. Appellant challenges the sufficiency of the evidence of all the charges;

2. Appellant challenges the weight of the evidence of all the charges;

3. Appellant claims evidentiary error occurred when evidence relating to a fire at Appellant's residence in 2011 was admitted pursuant to Pa.R.E. 404(b);

4. Appellant claims evidentiary error occurred when a witness testified concerning Appellant's statements during Appellant's Examination Under Oath;

5. Appellant claims it was error to continue the trial *in absentia*, when Appellant failed to appear on the third day of trial;

6. Appellant raises three sentencing issues concerning merger of charges.

## DISCUSSION

### I. The Sufficiency of the Evidence Claims

In the 1925(b) Statement, Appellant generically asserts in boilerplate fashion, the evidence was insufficient to support his convictions at Counts One through Six because Appellant claims there was no evidence Appellant placed an aerosol can in her oven. Appellant generically alleges the evidence was insufficient to support the verdicts at Counts Seven and Eight because there was insufficient evidence Appellant lied and/or made fraudulent claims to Allstate Insurance Company (Allstate). *See 1925(b) Statement, ¶¶ 1-2.*

6

## A. Waiver

Appellant's sufficiency claims are waived as they do not comport with the requirements of Pa.R.A.P. 1925(b).

> If Appellant wants to preserve a claim that the evidence was insufficient, then the 1925(b) statement needs to specify the element or elements upon which the evidence was insufficient. This Court can then analyze the element or elements on appeal. [Where a] 1925(b) statement [ ] does not specify the allegedly unproven elements[,] ... the sufficiency issue is waived [on appeal]. *Commonwealth v. Williams*, 959 A.2d 1252, 1257 (Pa. Super. 2008), *quoting Commonwealth v. Flores*, 921 A.2d 517, 522-523 (Pa. Super. 2007).

*Commonwealth v. Tyack*, 128 A.3d 254, 260 (Pa. Super. 2015). Such specificity is particularly important in cases where an Appellant has been convicted of multiple crimes, each of which contains numerous elements the Commonwealth was required to prove beyond a reasonable doubt. *See Commonwealth v. Freeman*, 128 A.3d 1231, 1248 (Pa. Super. 2015).

In the instant case, Appellant was convicted of multiple crimes. Appellant's 1925(b) Statement fails to specify which element or elements of any of the crimes at Counts One through Eight the Commonwealth failed to prove beyond a reasonable doubt. Appellant's bald assertions regarding sufficiency of the evidence are far too vague to identify the pertinent issue(s) for the Trial Court to address. Appellant failed to point to any element of any crime at Counts One through Six where the evidence was arguably insufficient to support the verdict. Thus, Appellant has waived her challenges to the sufficiency of the evidence to convict at Counts one through Six.

## B. Sufficiency of the Evidence Standard

Assuming, *arguendo*, Appellant's challenges to the sufficiency of the evidence are not waived, the Trial Court will address the claims *ad seriatim.*

7

When evaluating a challenge to the sufficiency of the evidence, the Court must determine whether, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, together with all reasonable inferences from that evidence, the trier of fact could have found each element of the crime charged was established beyond a reasonable doubt. *Commonwealth v. Hargrave,* 745 A.3d 20, 22 (Pa. Super. 2000), *appeal denied,* 760 A.2d 851 (Pa. 2000)(internal citations omitted); *Commonwealth. v. Brunson,* 938 A.2d 1057, 1058 (Pa. Super. 2007); *Commonwealth v. Chambers,* 599 A.2d 630, 633 (Pa. 1991). The Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence. *Commonwealth v. Hopkins,* 747 A.2d 910, 913 (Pa. Super. 2000). The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence, and any questions or doubts are to be resolved by the fact-finder, unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *Commonwealth v. Hopkins, supra* at 913-14.

Viewing the evidence against this standard, Appellant's contentions are without merit.

## C. Factual Basis and Elements of the Crimes

### 1. Count One: Arson and Related Offenses

The factual basis for the charge of Arson and Related Offenses (Count One) is Appellant intentionally started a fire to destroy and/or damage her residence at 235 East 32nd Street in Erie, and in so doing, recklessly placed responding firefighters, police or others actively engaged in fighting the fire in danger of death or bodily injury. *Amended Criminal Information filed September 13, 2016 (Amended Information).*

Arson and Related Offenses is defined as follows:

(a) Arson endangering persons.

8

(1) A person commits a felony of the first degree if he intentionally starts a fire or causes an explosion, or ... , whether on his own property or on that of another, and if:

    (i)    he thereby recklessly places another person in danger of death or bodily injury, including but not limited to a firefighter, police officer or other person actively engaged in fighting the fire; ...

*18 Pa.C.S.A. §3301(a)(1)(i).*

A person "intentionally" starts a fire when it is his "conscious object to engage in conduct of that nature or to cause such a result." *18 Pa.C.S.A. §302(b)(1).* A person recklessly places another in danger of death or bodily injury when he "consciously disregards a substantial and unjustifiable risk the [danger of death or bodily injury] exists or will result from his conduct," and disregard of that risk is grossly unreasonable. *18 Pa.C.S.A. §302(b)(3).*

## 2. Count Two: Arson and Related Offenses, Arson Endangering Property

The factual basis for Arson and Related Offenses, Arson Endangering Property (Count Two) is Appellant intentionally started a fire to destroy and/or damage her residence, to collect insurance for the loss. *See Amended Information.*

The crime of Arson and Related Offenses, Arson Endangering Property is defined as follows:

(c) Arson endangering property.--A person commits a felony of the second degree if he intentionally starts a fire or causes an explosion, whether on his own property or that of another, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, and if:

    ...

(3) he commits the act with intent of destroying or damaging any property, whether his own or of another, to collect insurance for such loss.

*18 Pa.C.S.A. §3301(c)(3).*

As indicated previously, a person "intentionally" starts a fire when it is his "conscious

9

object to engage in conduct of that nature or to cause such a result." *18 Pa.C.S.A. §302(b)(1).*

### 3. Count Three: Risking Catastrophe

The basis for the charge of Risking Catastrophe (Count Three) is the fire started by Appellant created the risk of spreading to surrounding houses. *See Amended Information.*

The crime of Risking Catastrophe is defined as follows:

> (b) Risking catastrophe.--A person is guilty of a felony of the third degree if he recklessly creates a risk of catastrophe in the employment of fire, explosives or other dangerous means listed in subsection (a) of this section.

*18 Pa.C.S.A. §3302(b).*[6]

A "catastrophe" is a situation capable of causing "widespread injury or damage". *Commonwealth v. Hughes,* 364 A.2d 306, 312 (Pa. 1976). A person acts "recklessly" in creating a risk of catastrophe if he consciously disregards a substantial and unjustifiable risk a catastrophe exists or will result from his conduct, and disregard of that risk involves a gross deviation from the standard of conduct a reasonable person would observe in the person's situation. *See 18 Pa.C.S.A. §302(b)(3); Commonwealth v. Hughes,* 364 A.2d at 311.

### 4. Counts Four, Five and Six: Recklessly Endangering Another Person

The basis for the charges of Recklessly Endangering Another Person is Appellant's reckless conduct placed the following in danger of death or serious bodily injury: occupants in neighboring houses (Count Four), responding fire fighters (Count Five) and responding police officers (Count Six). *See Amended Information.*

A person is guilty of Recklessly Endangering Another Person "if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." *18 Pa.C.S.A. §2705.*

---

[6] The "other dangerous means" listed at subsection (a) of Section 3302 are not relevant here. *See 18 Pa.C.S.A. §3302(a).*

10

A person acts "recklessly" if he consciously ignores a substantial and unjustifiable risk that death or serious bodily injury will result from his conduct, and further, the risk is so serious that, considering the actor's conduct and circumstances known to him, the actor's conduct involves a gross deviation from the standard of conduct a reasonable person world observe in the situation. *See 18 Pa.C.S.A. §302(b)(3).*

**5. Count Seven: Insurance Fraud (statement)**

The factual basis for the charge of Insurance Fraud (Count Seven) is Appellant knowingly and with the intent to defraud the Allstate Insurance Company, submitted claims for the loss of personal property and real estate. The claims for loss contained false, incomplete or misleading information. *See Amended Information.*

Pursuant to 18 Pa.C.S.A. §4117(a)(2), a person commits Insurance Fraud if he or she "[k]nowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim." *18 Pa.C.S.A. §4117(a)(2).*

By its plain language, this subsection of the insurance fraud statute requires the Commonwealth to establish 1.) Appellant presented a statement to the insurance company forming a part of or in support of an insurance claim, 2.) the statement contained false, incomplete or misleading information concerning any fact or thing material to the claim, and 3.) Appellant acted knowingly and with the intent to defraud the insurance company. *See 18 Pa.C.S.A. §4117(a)(2).*

> A "statement" is: [a]ny oral or written presentation or other evidence of loss, injury or expense, including, but not limited to, any notice, statement, proof of loss, bill of lading, receipt for payment, invoice, account, estimate

11

of property damages, bill for services, diagnosis, prescription, hospital or doctor records, X-ray, test result or computer-generated documents.

*18 Pa.C.S.A. §4711.*

A fact is material "if it concerns a subject relevant and germane to the insurer's investigation as it was then proceeding, or if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented." *Church Mut. Ins. Co. v. All. Adjustment Grp.,* 102 F. Supp. 3d 719, 727 (E.D. Pa. 2015), quoting *Wezorek v. Allstate Ins. Co.,* No. 06-1031, 2007 WL 2264096, at *15 (E.D.Pa. Aug. 7, 2007) (citations and quotation marks omitted).

## 6. Count Eight: Insurance Fraud (application)

The factual basis for the charge of Insurance Fraud (Count Eight) is Appellant knowingly and with the intent to defraud Allstate Insurance Company, filed a fraudulent or misleading application for insurance. *See Amended Information.*

Pursuant to 18 Pa.C.S.A. §4117(b)(4), "[a] person may not knowingly and with intent to defraud any insurance company, self-insured or other person file an application for insurance containing any false information or conceal for the purpose of misleading information concerning any fact material thereto." *18 Pa.C.S.A. §4117(b)(4).*

By its plain language, this subsection of the statute requires the Commonwealth to establish: 1.) Appellant knowingly filed an application for insurance, and 2.) knowingly and with the intent to defraud provided false, misleading or inaccurate information material to the application. *See 18 Pa.C.S.A. §4117(b)(4).*

A person acts "knowingly" when a person is aware that it is practically certain that his conduct will cause such a result. *18 Pa.C.S.A. §302(b)(2).*

A fact is material "if it concerns a subject relevant and germane to the insurer's investigation as it was then proceeding, or if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented." *Church Mut. Ins. Co. v. All. Adjustment Grp.*, 102 F. Supp. 3d 719, 727 (E.D. Pa. 2015), quoting *Wezorek v. Allstate Ins. Co.*, No. 06–1031, 2007 WL 2264096, at *15 (E.D.Pa. Aug. 7, 2007) (citations and quotation marks omitted).

## D. Evidentiary Review

The pertinent evidence, as it pertains to the sufficiency and weight of the evidence claims, is summarized as follows.

### 1. Brian O'Connor, Sales Agent, Buhl Agency

The Commonwealth presented the testimony of Brian O'Connor, sales agent for the Buhl Agency, an agency of Allstate Insurance Company. *Transcript of Proceedings, September 19, 2016 (Tr. 1), pp. 20-37.* O'Connor responded to Appellant's request for quotes for homeowner's insurance on the residence at 235 East 32nd Street, Erie, Pennsylvania, and for auto insurance. *Tr. 1, pp. 21-22, Commonwealth Ex. No. 1.*

On November 20, 2014, O'Connor telephoned Appellant to obtain information to prepare the insurance application and to supply Appellant with the insurance quotes. Among other things, Appellant advised O'Connor there were two residents and no dogs in the household; Appellant had lived there since December 1993; the roof was replaced in 2014 and was one year old; the residence had central heating and no air conditioning; Appellant had property insurance through Farmer's Insurance; and the residence was not in the course of construction. *Tr. 1, pp. 24-27; 31-32.* O'Connor used the information supplied by Appellant to complete the insurance application, and to supply Appellant with quotes to purchase the insurance.

13

A few days later, on November 26, 2014, Appellant notified O'Connor she wanted to purchase the insurance. At O'Connor's request, Appellant supplied additional information. O'Connor reviewed a few additional matters with Appellant, and e-mailed her the application. Allstate subsequently bound over a policy of homeowner's insurance, which was to become effective December 3, 2014. Appellant was placed on an "easy payment plan" whereby scheduled monthly insurance premiums were to be automatically debited from Appellant's checking account. *Tr. 1, pp. 21-28, 30; Commonwealth Ex. No. 1.*

As part of the underwriting process, Allstate scheduled a home inspection of Appellant's residence. The home inspection revealed severe problems with the condition of the residence, including trash and debris in the yard or porch, dry rot and holes on the front porch or deck, roof damage, siding/frame exterior damage, boarded up windows with broken glass, and damaged fencing.

As a result, on January 16, 2015, Allstate issued a notice of cancellation, effective February 26, 2015. The notice of cancellation identified defects in the property as revealed by the home inspection. *Tr. 1, p. 29; Commonwealth Ex. 2.* Allstate automatically removed Appellant from the easy payment plan. *Tr. 1, p. 30.* However, Appellant contacted O'Connor's office and arranged to pay the insurance premiums on the policy up to the effective date of cancellation, February 26, 2015. *Tr. 1, pp. 30-31.* This was unusual, in O'Connor's experience, as most people in the situation purchase coverage somewhere else. *Tr. 1, p. 31.*

## 2. Daryl Pfadt, Field Inspector, Mueller Insurance Services

The Commonwealth presented the testimony of Daryl Pfadt, field inspector for Mueller Insurance Services. On December 1, 2014, Pfadt performed the home inspection of Appellant's residence requested by Allstate. *Tr. 1, pp. 37-53.* Appellant told Pfadt she had no dogs. *Tr. 1, p. 49.* Pfadt observed poor roof condition, boarded and broken windows, missing or damaged

14

siding, dry rot and a hole on the front porch decking, and trip hazards in the yard. *Tr. 1, pp. 43-44; Commonwealth Ex. 3.* Pfadt testified concerning the findings in his report, and Commonwealth Exhibits 4-25, the photographs he took of Appellant's residence. *Tr. 1, pp. 40-51.*

### 3. Carl Richard Hannah

The Commonwealth presented the testimony of Carl Richard Hannah. *Tr. 1, pp. 53-83.* Hannah has known Appellant for approximately 15 or 16 years, during which time he and Appellant lived together on and off. *Tr. 1, pp. 54-55.* They have one child together, Jackson, age 14. *Tr. 1, pp. 54-55.* Appellant has four other children: Janet, an adult child; Jaden, age 17; Lily, age six or seven; and Violet, the youngest. *Tr. 1, pp. 54, 57.*

Hannah was uncertain when Appellant first began living at 235 East 32nd Street. Hannah spent time at the residence, including overnights. *Tr. 1, pp. 55-56.* There was a house fire at 235 East 32nd Street in October, 2011. Following the 2011 fire, Appellant and the children moved to a residence on Liberty Street which Appellant owned. *Tr. 1, p. 56.* Appellant and the children remained at the Liberty Street residence until July of 2014, when Appellant and the children returned to the residence at 235 East 32nd Street. Hannah assisted with the move back to the 32nd Street residence. In February of 2015, approximately seven months later, the second home fire occurred at 235 East 32nd Street. *Tr. 1, pp. 58-59, 61.*

The East 32nd Street residence remained vacant while Appellant and the children resided at the Liberty Street residence. Appellant sold the residence on Liberty Street shortly before returning to 235 East 32nd Street. *Tr. 1, pp. 61, 73.* After Appellant returned to the 32nd Street address, Hannah assisted with some home maintenance issues, including making repairs to the top, flat portion roof and installing a shower in the basement. *Tr. 1, pp. 66-67.*

15

Hannah testified concerning the items which remained behind at the 32nd Street address after the first fire. *See Tr. 1, pp. 60, 63, 64, 67.* Hannah also testified concerning the items of personal property left behind at the Liberty Street address, when Appellant returned to the 32nd Street address. *See Tr. 1, pp. 59-60, 62-63, 65-66.* Hannah assisted Appellant in moving the following items from Liberty Street to the 32nd Street address when Appellant returned there in July of 2014: a flat screen TV from Appellant's bedroom, a couple of older TVs, two computers, and a couple of beds. *Tr. 1, pp. 61-62.* At some point, Hannah helped move an "industrial refrigerator" to 32nd Street. *Tr. 1, pp. 59-60.* He testified there was no dishwasher at 32nd Street. *Tr. 1, pp. 60-61.* There were two used couches at 32nd street. *Tr. 1, p. 61.*

On February 18, 2015, Hanna was caring for Appellant's dogs. Appellant had told him her pipes broke; she had to go to a hotel; and she wasn't allowed to take the pets to the hotel. *Tr. 1, pp. 70-71.* This was the first time Hannah had ever watched Appellant's dogs. *Tr. 1, p. 74.*

Hannah testified Appellant was to pick up the dogs the night the fire occurred. *Tr. 1, p. 70.* The arrangements to pick up the dogs were made a few days to one week before the fire. Hannah was to take two of the children, Jackson and Jayden, shopping the evening of February 18th, while Appellant prepared dinner. *Tr. 1, pp. 69-70.*

The evening of February 18th, while Hannah was shopping with the children, the child, Jackson, received a telephone call advising "his house just exploded." *Tr. 1, p. 71.* Hannah dropped off the children, picked up Appellant, and proceeded to Appellant's residence where they found Appellant's residence engulfed in flames. Appellant spoke with the fire inspector at the scene. *Tr. 1, p. 72.*

### 4. Jeremiah Wodarski

The Commonwealth presented the testimony of Jeremiah Wodarski. *Transcript of Proceedings, September 20, 2016 (Tr. 2), pp. 4-31.* Wodarski has known Appellant for

16

approximately 30 years, and has been in a relationship with Appellant for the past six to eight years. Wadarski resided with Appellant and her children at the 32nd Street address in 2011. *Tr. 2, pp. 5-6.* Wodarswki testified to the contents of the residence in 2011, which included normal household appliances, numerous TVs, desk top computers, a large desk and large kitchen table. *Tr. 2, pp. 6-7.*

Appellant received insurance proceeds from the fire in 2011. *Tr. 2, p. 8.* Following the fire, Appellant moved to the Liberty Street residence with the children. Tr. 2, p. 9. Appellant obtained new appliances, electronic devices and furniture. Wodarski had regular contact with Appellant at the Liberty Street address from April, 2013 to June, 2013. *Tr. 2, pp. 10-11.*

Appellant frequently spoke with Wodarski about wanting to relocate to a different state, preferably Florida. His understanding was that Appellant's return to the 32nd Street residence following the 2011 fire was only intended to be a temporary stepping stone to relocation out-of-state. *Tr. 2, pp. 10-11.*

In February, 2015, Appellant telephoned Wodarski and requested assistance with broken pipes in the basement of the residence. *Tr. 2, pp. 11-12.* Appellant had shut the water off, and went to a motel. *Tr. 2, pp. 13-14; 17.* Wodarski performed the repairs approximately three days later. At that time, he observed at the 32nd Street address some of the same furnishings, etc., as he had seen in the residence on Liberty Street, including TVs; the desk, and kitchen table. *Tr. 2, p. 15.* The second fire at the 32nd Street Address occurred approximately one week to ten days after Wodarski repaired the broken pipes. Tr. 2, p. 17.

### 5. Val Leone, Children's Behavioral Health

The Commonwealth presented the testimony of Val Leone, an employee of Children's Behavioral Health. Leone had a scheduled two-hour appointment with one of Appellant's children on February 18, 2015. *Tr. 2, pp. 31-36.* Appellant was present at Appellant's residence

17

when Leone picked up the child at 3:20 p.m., and when Leone returned the child at 5:20 p.m. When Leone returned the child, Leone did not enter the residence. He watched the child walk into the house, and immediately left. *Tr. 2, pp. 31-33.*

### 6. Jacob Vallimont, Neighbor

The Commonwealth presented the testimony of Jacob Vallimont, Appellant's neighbor who resided at 233 East 33rd Street in Erie. Vallimont made observations which assisted in determining the origin and cause of the fire at Appellant's residence on February 18, 2015. *Tr. 2, pp. 36-41.*

After work on February 18, 2015, Vallimont turned into his driveway and observed a small flame in a large window at the back of Appellant's residence. Thinking the flame might have been a candle, he wasn't initially alarmed. He walked to his door, turned around, and saw the flame was bigger and growing quickly, catching the house on fire. Vallimont immediately called 911. *Tr. 2, pp. 37-38.*

While Vallimont spoke with the 911 operator, the fire continued to grow rapidly. After the 911 call ended, Vallimont remained outside and watched as the house became engulfed in flames and police and firefighters arrived. *Tr. 2, p. 39.*

### 7. Martin Heid, Deputy Chief, City of Erie Fire Department

The Commonwealth presented the testimony of Martin Heid, Deputy Chief, City of Erie Fire Department. *Tr. 2, pp. 41-56.* Heid is a 30-year veteran with the fire department, and has been Deputy Chief for 12 years. Members of the fire department were the first to respond to this fire. *Tr. 2, p. 44.*

Heid was en route to another call when a fire dispatch came across at 5:47 p.m. for the structure fire at Appellant's residence. Heid rerouted fire rigs, and arrived at Appellant's residence six minutes after the dispatch came in. Already, heavy flames were coming from all

18

downstairs windows, standing approximately ten feet out of the windows. Fire was also coming out of the second floor windows. *Tr. 2, pp. 42-43.* All four sides of the house were fully engulfed. *Tr. 2, p. 44.*

Due to the extent of the fire, there was no means to access the interior to address the safety of anyone inside. Heid's next concern was to ensure neighboring residences didn't also become engulfed in flames. *Tr. 2, pp. 44.* The house to the east was close, approximately 12 feet away. To the west, there was a house 50 feet away, across from a vacant lot. *Tr. 2, pp. 44-45.*

The frigid weather presented particular hazards for the firemen. The temperature was dropping into the teens; there was snow accumulation of eight to ten inches; it was snowing out; the roads were slick; and the rigs were using chains to reach the residence. The firefighters faced the risk of hypothermia. Due to the severity of the fire and weather conditions, two extra rigs were brought in so the firefighters could cycle through rehab and get checked out by Emergycare paramedics. *Tr. 2, pp. 45-46.*

More firefighters than usual were placed at risk in fighting this fire. Most fires average 20 to 24 fire department personnel on the scene. In this instance, 36 to 40 members of the fire department responded. *Tr. 2, p. 46.* Also responding to the fire were: Emergycare paramedics, City of Erie Police, Penelec Electric Company and National Fuel Gas. Mechanics also came to the scene. *Tr. 2, p. 46.*

The large quantity of fire coming from Appellant's residence was highly unusual for a daytime fire. Usually, during the daytime, a fire would be detected before it became so large. *Tr. 2, p. 48.*

19

The intensity of the fire was particularly unusual. The heat from this fire caused the siding on the house to the east to begin to melt, and also, the siding on the house to the west, which was 50 feet away, to begin to melt. Firefighters set up a water curtain between Appellant's residence and the house to the east, and a tower was set up on the west side, to protect the neighboring residences. The tower on the west had to be backed up 20 to 30 feet from where it would normally be positioned, to protect the rig from the heat and fire. *Tr. 2, pp. 48-49.*

Approximately 20 minutes into the fire, the power line from the house to the pole burnt through, and fell across the tower, putting the tower out of commission for approximately 45 minutes until Penelec crew arrived and disconnected the power to the line. Though people were nearby, fortunately no one was on the rig at the time and no one was injured from this. *Tr. 2, p. 49.*

Approximately 30 minutes into the fire there was a partial building collapse: the second floor in the back collapsed into the first floor. Fire became trapped inside. Rigs remained there, and firefighters went back and forth all night until 8:30 a.m. the next morning, to extinguish hot spots that erupted in the areas of collapse. *Tr. 2, pp. 50-51.*

For a short time, as all six fire rigs in the City were called to respond to this fire, there were no fire rigs left to protect the City. Had another fire occurred during this time, the Fire Department would have had to call in aid from another county. *Tr. 2, p. 51*

It took longer than usual - one hour and 11 minutes -- for the firefighters to get this fire under control. Most fires the City of Erie Fire Department has under control in 10 or 15 minutes, Heid testified. *Tr. 2, pp. 51-52.*

Footage of the fire taken by media who arrived on the scene was played for the jury and admitted as Commonwealth Ex. 28. *Tr. 2, p. 53.*

## 8. Guy Santone Fire Chief, City of Erie Fire Department

The Commonwealth presented the testimony of Guy Santone, Fire Chief, City of Erie Fire Department. *Tr. 2, pp. 56-89.* Santone, a 29-year veteran with the fire department, has served as Fire Chief since June, 2016. Santone served as Chief Fire Inspector for approximately eight and one-half years. *Tr. 2, p. 57.* Santone was qualified as an expert in fire investigations. *Tr. 2, pp. 57-58.*

Santone arrived at the scene at 6:13 p.m., and remained there until approximately 9:00 p.m. *Tr. 2, pp. 60, 64.* He conducted interviews. Appellant was in a patrol car when Santone arrived. *Tr. 2, p. 61.* Appellant told Santone she was not at home; that she had gone to the store; and she had been gone approximately one hour. *Tr. 2, p. 62.* Santone asked Appellant if there was anything in the home that could have ignited a fire. Appellant advised she had space heaters in the upstairs bedrooms and downstairs in the living room which were turned on. *Tr. 2, p. 62.* Appellant confirmed the dogs had been removed from the home. *Tr. 2, p. 63.*

Santone also spoke with Carl Hannah. *Tr. 2, p. 64.*

Santone testified the intense radiant heat from this fire presented the risks that the homes to the east and west of Appellant's residence would catch fire, as evidenced by the buckled siding on those homes. *Tr. 2, pp. 69, 71; Commonwealth Exs. 38-41 (photographs).* Although the house to the west of Appellant's residence was approximately 70 feet away, the siding to that residence buckled from the extreme heat which emanated from the southwest corner of Appellant's residence. Had the firefighters not put water on both residences to cool them down, they would have caught fire. *Tr. 2, pp. 70-72.*

Due to the low temperature, and the icy conditions which caused firemen to fall, extra firemen were brought in to relieve the "first-in companies." *Tr. 2, p. 72.* Further, the house was

unstable, and presented the risk of collapse onto firefighters. *Tr. 2, p. 69.* The police were also in danger as they did not have the same protective gear as the firefighters. *Tr. 2, p. 72.*

Santone called Andy Zimmerman, Code Enforcement Officer and head of the Building Inspection Division, for his opinion whether the house was structurally unsafe and needed to be razed. *Tr. 2, p. 65.* Zimmerman determined the structure needed to be taken down as soon as possible. *Tr. 2, p. 65.* The following day, Zimmerman hired someone to raze the house. *Tr. 2, p. 65.* Santone estimated the temperature was close to zero degrees. *Tr. 2, p. 65.*

Santone returned the next day to continue the investigation. *Tr. 2, pp. 65-66.* He found the entire residence encapsulated in ice from the water used to fight the fire. As it was impossible for Santone to enter the residence, at that time he was unable to determine the cause of the fire. *Tr. 2, p. 66.* However, Santone was able to determine the origin of the fire. Based upon his experience, the interviews he conducted, the video of the fire, the fire patterns on the remaining structure, and the assessment the heaviest area of damage was to the southwest corner of the house, Santone opined the fire originated in the southwest corner of the residence. *Tr. 2, p. 66.* Generally, the area of heaviest damage indicates where the fire started. *Tr. 2, pp. 66-69; Commonwealth Exs. 32-37 (photographs).*

After Appellant's residence was razed, Santone recommended that Allstate hire a private investigator to investigate this fire, since the fire department did not have the resources to search through the rubble to conduct an appropriate investigation regarding causation. At that time, Santone left the cause of the fire as undetermined. *Tr. 2, p. 76.*

Allstate subsequently hired a private investigator. On April 9, 2015, Santone received a telephone call from Robert Rice, Maltase Fire Investigations. Rice asked Santone to meet him at Appellant's residence. Rice showed Santone a stove, where, inside the oven there was an aerosol

22

can. From the position of the can and the oven rack, it appeared the can had been placed in the oven. While the police photographed the aerosol can, material, like clothing material, was also found inside the oven. The police took the can and the material into evidence. Santone removed the stove and secured it in an evidence locker. *Tr. 2, pp. 77-79; Commonwealth Exs. 47-49 (photographs of can and material).*

Santone subsequently determined the cause of the 2015 fire was "aerosol – incendiary". Santone concluded the fire was set intentionally by placing the aerosol can in the oven to act as a timing device, to allow whoever placed the can in the oven to get away before it erupted. *Tr. 2, pp. 81-82.* Santone outruled a space heater as the cause of the fire. There was no report of a space heater in the kitchen, and no space heater was recovered in the kitchen. Some of the space heaters recovered elsewhere still had some sheathing on the wires, suggesting space heaters were not the cause of the fire. *Tr. 2, pp. 85-86.*

Santone also responded to the 2011 fire at Appellant's same residence. That fire originated in a dresser on the south wall in the front bedroom on the second floor, and was mostly contained to that room. *Tr. 2, pp. 72-75; Commonwealth Exs. 43, 46.* During that fire investigation, Appellant told Santone she had left for the store; she was pretty sure she had lit a candle upstairs; and she was unsure whether the candle was still burning when she left. Santone was unable to locate the remnants of a candle. *Tr. 2, p. 75.* Santone discovered a burnt aerosol can in a dresser drawer, and was immediately concerned. Santone ruled the cause of that fire as undetermined, because he was unable to locate an ignition source. *Tr. 2, pp. 74, 76; Commonwealth Exs. 43, 44.*

23

## 9. Robert Rice, Maltase Fire Investigation

Robert Rice, owner of Maltase Fire Investigation, testified on behalf of the Commonwealth. *Tr. 2, pp. 89-133.* Rice was qualified as an expert in fire investigation, origin and cause determination. *Tr. 2, pp. 89-93.*

At the request of Allstate, Rice conducted an investigation to determine the origin and cause of the fire to Appellant's residence on February 18, 2015. *Tr. 2, p. 94.* Rice received the assignment on February 20, 2015. At Rice's request, the site was secured. Due to the condition of the scene and the weather, the investigation commenced on April 9, 2015. *Tr. 2, pp. 98.* Rice utilized a backhoe, a loader and two dumpsters to "de-layer" the rubble and examine the contents. *Tr. 2, pp. 96.*

The demolished state of Appellant's residence did not impact the investigation. *Tr. 2, p. 99.* Rice photographed the area. Rice located the oven under debris, where the kitchen was located. The debris covering the oven protected it from weather conditions and tampering by third persons. There were no signs a backhoe, the only means to reach the oven under the debris (other than the backhoe used during Rice's investigation), had been to the scene. *Tr. 2, pp. 102-103.*

The oven was brought out, and Rice examined it. *Tr. 2, pp. 102-103, 124; Commonwealth Ex. 57.* The oven was found with its door closed, and there was no glass in the door. Rice opened the oven door and observed an aerosol container on the bottom with a rack "smashed down on top" of the container to hold it in place, and a very small amount of clothing. *Tr. 2, pp. 103-104, 107; Commonwealth Ex. 59.* At the top of the can, the plunger was missing, which would have allowed the aerosol to come out violently, like "an explosion-type of a fireball," after the oven was turned on and the contents of the can under pressure had been

24

sufficiently heated. *Tr. 2, pp. 105-106.* Ruptured glass in the oven door would allow flame and combustion to come out of the stove. *Tr. 2, p. 107.* The visible damage to the interior of the oven, an appliance made to withstand high temperatures, was a sign of extreme heat. *Tr. 2, p. 108.*

Rice concluded the aerosol can and small amount of clothing were deliberately placed inside the oven. Had the items arrived there by happenstance, a significant amount of additional debris would also have also been found in the oven. *Tr. 2, pp. 108-109.* Also, the can would not have been found in the same position. *Tr. 2, p.109.*

After inspection of the microwave and the three or four space heaters which were recovered, those items were out-ruled as possible causes of the fire. *Tr. 2, pp. 113-114.* The electrical transformer, the electrical meter socket, the electrical breaker panel in the basement, the hot water heater and the gas meter were also out-ruled as a possible cause of the fire. Tr. 2, pp. 114-.117. Rice opined the fire did not originate in the basement. *Tr. 2, p. 117-119.*

Based upon the times in the Computer Aided Dispatch (CAD) report, which provided call and response times, the fire grew quickly and to a high magnitude, and was an accelerated fire. *Tr. 2, p. 120.* Rice ultimately concluded the fire originated inside the stove in the kitchen, and the cause of the fire was "human interaction by placing an aerosol can and Class A combustibles, clothing, inside of the stove and turning on the stove." *Tr. 2, p. 121.*

"There was nothing – I can say with certainty there was nothing in this investigation that was tampered with that would have altered the outcome of my conclusion. Everything that I looked at was covered up and had to be removed with heavy equipment ...." *Tr. 2, p. 124.*

25

## 10. Holly Kelly, Special Investigative Unit, Allstate Insurance Company

Holly Kelly, a 17-year veteran of the Special Investigative Unit (SIU) at Allstate Insurance Company, testified on behalf of the Commonwealth. *Tr. 2, pp. 137-168.* Kelly was called by the Commonwealth to testify concerning prior bad acts of the Appellant, Appellant's misrepresentations to procure insurance for the 32nd Street residence; misrepresentations regarding the contents of the residence at the time of the 2015 fire; and the facts and circumstances surrounding the fire.

Allstate investigated Appellant's insurance claim for the 2015 house due to prior fires at the residence, and the policy was in cancellation status when the subject fire occurred. *Tr. 2, p. 139.* On February 25, 2015, Kelly requested a recorded statement from Appellant. Appellant declined, due to her pregnancy. *Tr. 2, p. 139.* Allstate scheduled Appellant's Examination Under Oath for April 17, 2015 to learn facts and circumstances surrounding the fire. Kelly testified Examinations Under Oath are routinely conducted in investigations. The transcript of Appellant's Examination Under Oath became part of the investigative file of Allstate. Appellant was represented by counsel at the Examination Under Oath. Kelly did not attend the Examination Under Oath. *Tr. 2, pp. 141-143, 161; Commonwealth Ex. 102, Examination Under Oath of April 17, 2015 (Tr. EUO), p. 4.*

As testified to by Kelly, Appellant related the following during the Examination Under Oath.

Only Appellant and possibly Janet had access to the residence. Appellant testified the children, Jaden, Jackson and Lily, and "two little tiny dogs" resided with her at the time of the fire. She testified about the contents of the residence at the time of the fire.

26

The following items were in the basement: a TV, a weight set, a new washer and dryer, an uninstalled dishwasher purchased from Best Buy, a chain saw, new carpentry tools and new bicycles. *Tr. 2, pp. 143-146.*

The following items were on the first floor: pots and pans, silverware, a stove, a refrigerator and a freezer, all purchased with cash; couches and recliners purchased in 2014 from Arthur F. Schultz; two flat screened TV's purchased at HhGregg and Wal-Mart; a mattress and box spring purchased two months ago at Arthur Schultz and American Freight; an entertainment center purchased in 2014; and computers purchased at Best Buy. *Tr. 2, pp. 146-148.*

The following items were present on the second floor: new bedroom furniture including a double bed, a bedside table and two dressers she purchased from John V. Schultz; and a bed and dresser purchased from American Freight. *Tr. 2, pp. 148-149.*

Appellant was insured by Farmers when the 2011 fire occurred at the 32nd Street residence. Farmers paid Appellant "maybe like 25" for the claim for loss of contents from the fire. *Tr. 2, p. 149.*

When Appellant applied for homeowner's insurance on the 32nd Street residence in November of 2014, Appellant falsely advised she was already insured by Farmers. Had Allstate's representative, Mr. O'Connor, known Appellant had not been insured for over one year, the representative may not have written the policy. *Tr. 2, pp. 156-157.*

Appellant purchased a residence at 4017 Liberty Street in Erie. Appellant let her insurance on the residence lapse because she didn't believe insurance was needed due to the age of the house. Appellant sold the residence in May, 2014. When Appellant returned to the residence on 32nd Street, she purchased insurance from Allstate. *Tr. 2, pp. 143-144, 149-151.*

27

On Monday, February 16, 2015, two days before the fire, Appellant had problems with frozen pipes in the basement, over the shower. Appellant denied the pipes burst; they only froze. Appellant stayed overnight at a hotel. Jeremiah Wodarski replaced the elbow on the piping. Appellant went to her residence on Tuesday, because Carl was at work and Appellant didn't have the keys to his residence to get the dogs. Appellant went to Carl's house on Wednesday, February 18th. After Carl took Jackson shopping, they were going to get the dogs and return to Appellant's residence. *Tr. 2, p. 152-154.*

Appellant related she had three space heaters at the residence on February 18, 2015: one in the living room, one in the downstairs bedroom and one in the upstairs bedroom. Appellant was present at the residence one hour before the fire on February 18th. After a mobile therapist left, Appellant left, and locked the door behind her. *Tr. 2, pp. 154-155.*

Appellant submitted to Allstate a two-page list of the contents of the house. Appellant was given opportunity to supplement the list, and indicated she had items to add to the list. However, the list was never updated. *Tr. 2, p. 157; Commonwealth Ex. 103.* Appellant failed to supply a written list of the items she testified to during the Examination Under Oath. *Tr. 2, p. 159.* While Allstate's investigation continued, Allstate paid Appellant approximately $11,000.00, plus approximately $20,000.00 for living expenses. *Tr. 2, p. 158.*

Appellant continued to contact Allstate requesting additional payments. Despite Allstate's repeated requests for Appellant to supply a complete contents list, Appellant failed to comply. *Tr. 2, p. 167.*

By letter dated November 17, 2015, Allstate denied coverage for the claimed losses. Coverage was denied for Appellant's failure to cooperate, material misrepresentation of facts,

and Allstate's belief the fire was intentionally set. *Tr. 2, pp. 159-160; Commonwealth Ex. 104 (Allstate Notice of Denial/Coverage Determination of November 17, 2015).*

### 11. Retail Store Representatives

#### a. Alice Barto, John V. Schultz Furniture

The Commonwealth presented the testimony of Alice Barto, Customer Service Manager for John V. Schultz. At John V. Schultz, a customer's name, address and telephone number is recorded with every purchase. A search of the store's business records under Appellant's name, address and phone number revealed no record of purchase by Appellant. *Tr. 2, pp. 170-173.*

#### b. Dan Schultz, Arthur F. Schultz Company

The Commonwealth presented the testimony of Dan Schultz, Chairman of the Arthur F. Schultz Company. The store has no records of purchases by Appellant. *Transcript of Proceedings, September 21, 2016 (Tr. 3), pp. 9-10.*

#### c. Nathan Fladry, Best Buy

The Commonwealth presented the testimony of Nathan Fladry, who works in asset protection at Best Buy. Best Buy maintains no record of cash purchases where a Rewards Zone Account is not used.

Best Buy has records of the following purchases by Appellant: On January 31, 2012, Appellant purchased a GE Stars refrigerator, an over-the-range microwave, an electric convection oven and a built-in dishwasher.

On October 1, 2014, Appellant exchanged one child's tablet for another, and purchased refreshments. *Tr. 3, pp. 11-15.*

### d. Lavette Dean, American Freight

The Commonwealth presented the testimony of Lavette Dean, Assistant Manager of American Freight.

On October 21, 2011, Appellant purchased a love seat, a sofa and a recliner.

On November 23, 2011, Appellant purchased a sofa and a love seat.

On February 12, 2012, Appellant purchased two sofas.

On December 4, 2014, Appellant purchased a mattress and foundation. *Tr. 3, pp. 15-18.*

## E. Discussion - The Sufficiency Of The Evidence

Appellant's claims of sufficiency of the evidence are meritless and must be dismissed.

### 1. Count One: Arson and Related Offenses and Count Two: Arson and Related Offenses, Arson Endangering Property

As described in the evidentiary review section above, the evidence viewed in the light most favorable to the Commonwealth, together with all reasonable inferences from the evidence, established beyond a reasonable doubt the elements of the arson crimes. It is obvious from the foregoing testimony Appellant was the person who intentionally started the fire at her residence and in so doing, recklessly placed others in danger of death or bodily injury, including the firefighters, police and responding personnel actively engaged in fighting the fire.

The record amply established the extreme heat and quantity of fire, combined with the weather conditions, placed others, including firefighters, police and all responders, at a substantial and unjustifiable risk of danger of death or bodily injury from the fire. Responders faced serious risk of injury or death from consequences of hypothermia; falls due to icy conditions; structural instability; the fallen power line; and exposure to the fire itself, among other things. *See testimony of Jacob Vallimont, Tr. 2, pp. 36-41; Martin Heid, Deputy Fire*

*Chief, Tr. 2, pp. 41-56; Guy Santone, Fire chief, Tr. 2, pp. 56-89 and Robert Rice, Tr. 2, pp. 89-93.*

The record also amply established Appellant intentionally started the fire to collect insurance for the loss. The jury found the evidence was sufficient to establish the fire was intentionally set. *See testimony of Guy Santone, Fire chief, Tr. 2, pp. 56-89 and Robert Rice, Tr. 2, pp. 89-93.* It is obvious from the evidence, including: the evidence of misrepresentations in procurement of insurance, Appellant's payment of the premiums while the policy was in cancellation status, Appellant's presence in the residence one hour before the fire and actions in locking the door as she left, the lack of other persons' access to the residence, and the lack of cooperation with the investigation, that Appellant was the person who set the fire, and Appellant did so to collect insurance proceeds. *See, inter alia, testimony of Brian O'Connor, Tr. 1, pp. 20-37; Darl Pfadt, Tr. 1, pp. 37, 53; Val Leone, Tr. 2, pp. 31-36; and Holly Kelly, Tr. 2, pp. 137-168.*

## 2. Count Three: Risking Catastrophe

The jury appropriately found each element of Risking Catastrophe was established beyond a reasonable doubt. Appellant consciously disregarded a substantial and unjustifiable risk a situation or fire capable of causing widespread injury or damage would result from her conduct, and this involved a gross deviation from the standard of behavior a reasonable person would have observed. It is obvious from the foregoing testimony the fire caused actual widespread damage, including the destruction of Appellant's residence and contents, and significant damage to the exteriors of neighboring residences; the fire was capable of causing widespread injury to larger than usual number of firefighters and responders called upon to battle the fire, and to occupants of the nearby residences. *See testimony of Martin Heid, Deputy Fire*

31

*Chief, Tr. 2, pp. 41-56; Guy Santone, Fire chief, Tr. 2, pp. 56-89 and Robert Rice, Tr. 2, pp. 89-93.*

### 3. Counts Four, Five and Six: Recklessly Endangering Another Person

The jury determined the elements of Counts Four, Five and Six were established beyond a reasonable doubt. It is obvious from the foregoing testimony Appellant, in setting fire to the residence, engaged in reckless conduct by consciously ignoring the substantial and unjustifiable risk that death or serious injury would result from her conduct, and the risk was so serious that her conduct involved a gross deviation from conduct a reasonable person would observe in the situation. It is obvious from the testimony as summarized herein the elements of Recklessly Endangering Another Person as to the occupants in the neighboring residences (Count Four), the responding firefighters (Count Five) and the responding police officers (Count Six) were met. *See testimony of Jacob Vallimont, Tr. 2, pp. 36-41; Martin Heid, Deputy Fire Chief, Tr. 2, pp. 41-56; Guy Santone, Fire chief, Tr. 2, pp. 56-89 and Robert Rice, Tr. 2, pp. 89-93. See also testimony of See testimony of Brian O/Connor, Tr. 1, pp. 20-37; Daryl Pfadt, Tr. 1, pp. 37-53; Carl Hannah, Tr. 1, pp. 53-58; Jeremiah Wodarski, Tr. 2, pp. 4-31; Val Leone, Tr. 2, pp. 31-36; Holly Kelly, Tr. 2, pp. 137-168.*

### 4. Count Seven: Insurance Fraud (statement) and Count Eight: Insurance Fraud (application)

The basis for the charge of Insurance Fraud at Count Seven is that Appellant knowingly and with the intent to defraud Allstate, submitted claims for loss of personal property and real estate which contained false, incomplete or misleading information. The record amply established Appellant presented statements to Allstate in support of her insurance claim for loss; the statements contained false, incomplete or misleading information about facts or things material to Appellant's claim, and Appellant did so knowingly and with the intent to defraud.

32

Appellant's "statements" included the two-page written contents list. *See testimony of Holly Kelly, Tr. 2, p. 157, Commonwealth Ex. 103.* Appellant also appeared for an Examination Under Oath, scheduled by Allstate. *See testimony of Holly Kelly, Tr. 2, pp. 137-168. Commonwealth Ex. 102, Examination Under Oath of April 17, 2015.*

The record established these statements contained false, incomplete or misleading information. The record is devoid of supporting documentation for items listed in in the two-page contents list. *See testimony of Holly Kelly, Tr. 2. pp. 137-138; Commonwealth Ex. 104, Allstate coverage decision letter of November 17, 2015.*

During the Examination Under Oath, Appellant testified about items of personal property located in the residence on the date of the fire. As examples, Appellant represented she had new bedroom furniture on the second floor, including a double bed, a bedside table and two dressers which she purchased from John V. Schultz. *See Tr. 2, pp. 148-149.* At trial, a representative of John V. Schultz testified a search of the store's business records under Appellant's name, address and phone number revealed no record of purchase by Appellant. *See testimony of Alice Barto, Tr. 2, pp. 170-173.*

Also, during the Examination Under Oath, Appellant testified couches and recliners purchased in 2014 from Arthur F. Schultz, and a mattress and/or box spring purchased two months earlier at Arthur F. Schultz were located on the first floor, *See Tr. 2, pp. 146-148.* At trial, a representative of Arthur F. Schultz testified the store has no records of purchase by Appellant. *See testimony of Dan Schultz, Tr. 3, pp. 9-10.*

During the Examination Under Oath, Appellant represented she purchased computers at Best Buy. *Tr. 2, pp. 146-148.* At trial, a representative from Best Buy had no record of purchase of computers by Appellant. *See testimony of Nathan Fladry, Tr. 3, pp. 11-15.*

33

During the Examination Under Oath, Appellant testified a dresser purchased from American Freight was on the second floor of the residence. *Tr. 2, pp. 148-149.* American Freight has no record of purchase by Appellant of a dresser. *See testimony of Lavette Dean, Tr. 3, pp. 15-18.*

Statements by Appellant concerning items of personal property claimed as lost in the fire were material to the insurance claim because Allstate, in determining whether to issue payment on the claim, would have attached importance to whether or not the property was lost in the fire. Insurance carriers generally only want to issue payment on legitimate claims.

The basis for the charge of Insurance Fraud at Count Eight is that Appellant knowingly and with the intent to defraud Allstate filed a fraudulent or misleading application for insurance.

It is obvious from the evidence Appellant knowingly and with the intent to defraud Allstate, filed an application for insurance which contained false information about a material fact. The following examples illustrate. In assisting Brian O'Connor complete Appellant's application for homeowner's insurance, Appellant told O'Connor only two persons lived in the household, and there were no pets; the roof was one year old and had been replaced in 2014; and the residence was not in the course of construction. *See testimony of Brian O'Connor, Tr. 1, pp. 24-27; 31-32.* Yet during the Examination Under Oath, Appellant admitted she resided in the house with three children and two dogs. *See testimony of Holly Kelly, Tr. 2, pp. 143-146.* The home inspection by Daryl Pfadt revealed the roof was in poor condition and clearly had not been replaced within one year. *See testimony of Daryl Pfadt, Tr, 1, pp. 43-44; Commonwealth Ex. 3.* From the condition of the exterior, which included multiple boarded-up windows, missing or damaged siding, and missing pieces of facie, one could reasonably conclude construction on the residence was underway. *See testimony of Daryl Pfadt, Tr, 1, pp. 43-44; Commonwealth Ex. 3.*

34

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, together with all reasonable inferences from that evidence, the trier of fact could have found each element of the crimes charged was established beyond a reasonable doubt. Appellant's sufficiency of the evidence claims are meritless, and must be dismissed.

## II. The Weight of the Evidence Claims

In the 1925(b) Statement, Appellant claims the weight of the evidence was inadequate to establish Appellant's guilt for the crimes at Counts One through Six because there was no evidence Appellant placed an aerosol can in her oven. Appellant also asserts the weight of the evidence was inadequate to establish Appellant's guilt for the offenses at Counts Seven and Eight due to the lack of sufficient evidence Appellant lied and/or made fraudulent claims to Allstate Insurance Company. *See 1925(b) Statement,* ¶¶ *15-16.* The weight of the evidence claims are wholly without merit.

### A. Weight of the Evidence Standard.

A verdict is against the weight of the evidence "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Blakeney,* 946 A.2d 645, 652 (Pa. 2008). See also, *Commonwealth. v. Thompson,* 648 A.2d 315, 324 (Pa.1994). A true weight of the evidence challenge "concedes that sufficient evidence exists to sustain the verdict but contends that the verdict was against the weight of the evidence." *Armbruster v. Horowitz,* 744 A.2d 285, 286 (Pa. Super. 1999)(citations omitted). An allegation the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth. v. Brown,* 648 A.2d 1177, 1189 (Pa. 1994).

"Appellate review, therefore, is a review of the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence." *Id.* "A trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence." *Commonwealth. v. Brown,* 648 A.2d at 1190.

According to the Supreme Court: "[W]hen the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion." *Commonwealth. v. Brown,* 648 A.2d at 1189, quoting *Thompson v. City of Philadelphia,* 493 A.2d 669, 673 (Pa. 1985). "Needless to say, ... a trial court's refusal to award a new trial because the verdict is claimed to be against the weight of the evidence is one of the least assailable of the trial court's rulings." *Commonwealth v. Thompson,* 648 A.2d 315, 324 (Pa.1994).

Credibility determinations are within the province of the jury. *Commonwealth. v. Smith,* 861 A.2d 892, 896 (Pa. 2004), citing *Commonwealth. v. Fisher,* 796 A.2d 1116, 1123 (Pa. 2001). The trier of fact while passing on the credibility of witnesses and the weight of the evidence produced, is free to accept all, part or none of the evidence. *Commonwealth. v. Pappas,* 845 A.2d 829, 836 (Pa. Super. 2004). Credibility determinations are solely within the jury's judgment and cannot be changed as a matter of law.

## B. Discussion – The Weight Of The Evidence

Viewing the evidence against this standard, Appellant's weight of the evidence claims are without merit. The Court did not abuse its discretion in denying Appellant's post-sentence motion for a new trial based upon Appellant's assertions at paragraph nos. 21 and 22 of the post-sentence motion the weight of the evidence was insufficient to prove the elements of the charges at Counts One through Eight. The jury's verdicts do not shock one's sense of justice. The

36

verdicts were amply supported by the evidence, as summarized herein. Appellant's weight of the evidence claims must be dismissed.

### III. Evidentiary Claims: Evidence Relating to the 2011 Fire

Appellant claims it was error to admit evidence concerning the fire at Appellant's residence in 2011. In the 1925(b) Statement, Appellant claims evidentiary error occurred pursuant to Pa.R.E. 404(b) for the following reasons:

1. The cause of the 2011 fire was undetermined and Appellant was not held criminally responsible for the fire.

2. The circumstances of 2011 fire were not substantially similar to the 2014 fire to indicate either a common scheme, plan or design; intent; or motive because the cause of the 2011 fire was undetermined and Appellant was not held criminally responsible for the fire.

3. The probative value of evidence of the 2011 fire was outweighed by prejudice to Appellant;

4. Evidence of the 2011 fire was inadmissible propensity evidence.

*See 1925(b) Statement, ¶¶3-8.*

### A. Legal Standards

In pertinent part, Pennsylvania Rule of Evidence 404(b) provides:

> **Rule 404. Character Evidence; Crimes or Other Acts**
>
> **(b) Crimes, Wrongs or Other Acts**
>
> > (1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> >
> > (2) *Permitted Uses.* [Evidence of a crime, wrong, or other act] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is

37

admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

*Pa.R.E. 404(b)(2).*

Relevant evidence is that which has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. *See Pa.R.E. 401.* "'[U]nfair prejudice' means 'a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.'" *Castellani v. Scranton Times, L.P.,* 124 A.3d 1229, 1245 (Pa. 2015). *See also, Pa.R.E. 403 (comment).*

> Because all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. As this Court has noted, a trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration *where those facts form part of the history and natural development of the events and offenses with which [a] defendant is charged.*

*Commonwealth v. Gonzalez,* 112 A.3d 1232, 1238 n.6 (Pa. Super 2015), *citing Commonwealth v. Owens,* 929 A.2d 1187, 1191 (Pa. Super. 2007)(citations omitted)(emphasis added).

**B. Discussion**

On September 1, 2016, Appellant filed a Motion in Limine to exclude evidence of the 2011 fire. On September 8, 2014, the Commonwealth filed a "Motion to Introduce Evidence of Other Crimes, Wrongs or Bad Acts Pursuant to Pennsylvania Rule of Evidence 404(b)", specifically: 1.) evidence of the 2011 fire; 2.) evidence of the June of 2012 cancellation by Farmer's Insurance of Appellant's homeowner's insurance on the residence; 3.) Appellant's return to the residence in July of 2014; and 4.) Appellant's efforts in November of 2014 to secure homeowner's insurance through Allstate Insurance Company.

38

On September 9, 2016, following a hearing, the Court denied Appellant's Motion in Limine, and granted the Commonwealth's Motion.

At the hearing, the Commonwealth asserted the evidence was relevant to furnish the complete story or context of events, culminating in the 2015 fire and fraudulent insurance claims. The Commonwealth asserted the complete story included the above-referenced events. The Commonwealth further asserted evidence was relevant to the *res gestae* of the case, e.g., Appellant returned to the residence after the 2011 fire; she allegedly made repairs to the property and purchased appliances and furnishings which Appellant claimed were lost in the fire in 2015; and Appellant went without homeowner's insurance on the residence during the period of time in between the two fires, until just before the second fire, when Appellant misrepresented facts to Allstate to procure homeowner's insurance. The Commonwealth also asserted evidence of the 2011 fire was relevant to show common plan or scheme, knowledge or absence of mistake, because Appellant gained experience in filing a homeowner's insurance claim.

Appellant's claims as set forth in the 1925(b) Statement are meritless. Appellant's contentions the evidence was inadmissible because a.) the cause of the 2011 fire was undetermined, and b.) because Appellant was not convicted of a crime for 2011 fire, are meritless. By its wording, Rule 404(b) does not require criminal culpability of a prior act, for evidence of the prior act to be admissible. *See Pa.R.E. 404(b)(2).*

Appellant's next claim the probative value of evidence was outweighed by the prejudicial effect of the evidence is without merit. The Court correctly determined the evidence was admissible.

Evidence of the 2011 fire and subsequent insurance claims and Appellant's actions leading up to the 2015 fire were relevant to show knowledge and absence of mistake. The

39

evidence was also relevant in that it supplied historical context of Appellant's actions which resulted in the criminal convictions. The evidence was particularly important for the jury to understand the events which culminated in the insurance fraud charges.

Appellant's last allegation the evidence constituted inadmissible propensity evidence is disingenuous. The evidence was not admitted for the purpose of demonstrating Appellant's propensity to serially set fire to her residences to collect insurance proceeds. The evidence was relevant and admitted to prove *"the history and natural development of the events and offenses"* with which Appellant was charged, in particular, the insurance fraud offenses. *See Commonwealth. v. Gonzalez*, 112 A.3d at 1238 n.6.

There was no abuse of discretion in the Court's evidentiary ruling. The evidence was admissible pursuant to Pa.R.E. 404(b). The evidence was relevant with regard to the fraud crimes because it supplied background information of the events which led to the charges of insurance fraud. The evidence formed part of the history and natural development of Appellant's actions, and its probative value outweighed any prejudice to Appellant. Appellant is not entitled to any relief concerning this issue.

## IV. Evidentiary Claims: Appellant's Sworn Examination Under Oath

### A. Background

As set forth above, Allstate's investigation of the claims for loss from the 2015 house fire included the taking of Appellant's Examination Under Oath. Allstate scheduled the Examination Under Oath to learn of facts and circumstances surrounding the fire. Allstate routinely requests Examinations Under Oath in investigations. Appellant's sworn testimony for the Examination Under Oath was taken on April 17, 2015. Both Appellant and Allstate were represented by

40

counsel at the Examination. The transcript of Appellant's testimony at the Examination Under Oath became part of Allstate's investigative file. *Tr. 2, pp. 141-143, 161; Commonwealth Ex. 102, Examination Under Oath of April 17, 2015 (Tr. EUO), p. 4.*

By letter dated November 17, 2015, Kelly notified Appellant of Allstate's decision to deny coverage for any damage to the residence or contents, due to, *inter alia,* Appellant's statements during the Examination Under Oath. *Tr. 2, pp. 159-160; Commonwealth Ex. 104.*

At trial, the Commonwealth presented Kelly's testimony concerning Allstate's investigation and Appellant's statements, including those made during the Examination Under Oath.[7] *Tr. 2, pp. 137-168.* The Commonwealth asserted Kelly's testimony regarding the Examination Under Oath was admissible as a business record, ordered and kept in Allstate's regular course of business. *Tr. 2, pp. 136-143.* The Court permitted Kelly to testify concerning Appellant's testimony during the Examination Under Oath.

**B. Discussion**

Distilled, in the 1925(b) Statement, Appellant claims error occurred at trial in admitting Appellant's statements during the Examination Under Oath as a prior inconsistent statement, which in this case Appellant contends was a contemporaneously recorded statement pursuant to Pa.R.E. 803.1(1)(C). *See 1925(b) Statement, ¶¶ 9-11. See also Pa.R.E. 803.1(1)(C).* The cases cited by Appellant in the 1925(b) Statement concern use of prior inconsistent statements to impeach a witness' trial testimony. Two of three cases cited by Appellant also concern the claim

---

[7] With the Court's permission, Holly Kelley to testified at trial *via* video conferencing. *See Order of Court, September 9, 2016.*

41

the prior inconsistent statement was a "contemporaneous verbatim recording." *See 1925(b) Statement, ¶¶ 9-11 and cases cited therein.*[8]

Appellant's arguments that statements during the Examination Under Oath were admitted under the prior inconsistent statement exception to the hearsay rule lack a factual basis, and are belied by the record. The hearsay exception at Pa.R.E. 803.1(1)(C), and the cases cited by Appellant, do not apply, as Appellant did not testify before she absented herself from trial. The Commonwealth did not argue argument the statements were admissible as a prior inconsistent statement. There was no ruling by the Court the statements were admitted as such. *See Tr. 2, pp. 135-136.* Appellant's claims in the 1925(b) Statement regarding admissibility of statements during the Examination Under Oath lack a factual basis and are meritless. Appellant's claims must be dismissed.

The Commonwealth offered Appellant's sworn statements during the Examination Under Oath under the business records exception to the hearsay rule at Pa.R.E. 803(6). *See Tr. 2, pp. 135-136.* The testimony of Kelly, as previously referenced herein, together with the record, demonstrate the transcription of the Examination Under Oath was prepared by a Registered Professional Court Reporter on April 20, 2015, three days after the Examination Under Oath[9]; the statement was requested and transcription of the statement/Examination Under Oath was kept and maintained the regular course of Allstate's business activity; and the making of the record was part of Allstate's regular protocol. *See Tr. 2, pp. 139-143; Commonwealth Ex. 102.* To the extent a particular statement of Appellant during Appellant's Examination Under Oath constituted hearsay, the requirements of Pa.R.E. 803(6) were therefore met. As no other claim of

---

[8] *Commonwealth v. Brady,* 507 A.2d 66 (Pa. 1986); *Commonwealth v. Johnson,* 707 A.2d 1114 (Pa. 1998) and *Commonwealth v. Halsted,* 666 A.2d 655 (Pa. 1995).

[9] *See the Court Reporter's Certification of Accuracy, Commonwealth Ex. 102.*

error was raised in the 1925(b) Statement concerning the Court's ruling on this issue, any further claims of error regarding the admissibility at trial of Appellant's sworn statements during the Examination Under Oath are deemed waived. *See Pa.R.A.P. 1925(b)(4)*.

Additionally, to the extent a particular statement of Appellant during Appellant's Examination Under Oath constituted hearsay at trial, the Court notes Appellant's sworn statements during the Examination Under Oath were admissible under Pa.R.E. 803(25) as statements of a party opponent. *See Pa.R.E. 803(25)*. There was no abuse of discretion in admitting Appellant's sworn statements during the Examination Under Oath.

## V. Continuation of Trial: Appellant *in absentia*

### A. Legal Standards

Appellant claims it was error to continue the trial *in absentia*, when Appellant failed to appear on the third day of trial. *See 1925(b) Statement, ¶¶ 12-14*. Appellant argues she was not absent "without cause" under Pa.R.Crim.P. 602(A), and continuation of the trial *in absentia* violated her rights to confront witnesses and due process

Pursuant to Pa.R.Crim.P. 602(A), "[t]he defendant's absence without cause at the time scheduled for the start of trial or during trial shall not preclude proceeding with the trial, including the return of the verdict and the imposition of sentence." *Pa.R.Crim.P. 602(A)*. The burden of proving the defendant's absence is without cause is upon the Commonwealth by a preponderance of the evidence. *See Commonwealth v. Scarborough*, 421 A.2d 147, 153 (Pa. 1980); *Comments, Pa.R.Crim.P. 602*.

In non-capital cases, a defendant may, by his actions, expressly or implicitly waive the right to be present at trial. *Commonwealth v. Wilson*, 712 A.2d 735, 737 (Pa. 1998); *Commonwealth v. Sullens*, 619 A.2d 1349, 1351( Pa. 1992). The waiver must be knowing and

43

voluntary. *Commonwealth v. Wilson*, 712 A.2d at 737. "When a defendant is initially present at the time the trial commences, then flees or fails to attend further proceedings, he or she is deemed to have knowingly and voluntarily waived his or her right to be present, and the trial court has the full authority to continue with that trial. *Commonwealth v. Wilson*, 712 A.2d at 737; *Commonwealth v. Johnson*, 764 A.2d 1094, 1098.

> A defendant who is released on bail before trial gives the court his or her assurance that he or she will stand trial and submit to sentencing of found guilty. Unless the defendant is prevented from attending the proceedings beyond his or her control, then the defendant is expected to be present at all stages of the trial. A defendant owes the court an affirmative duty to advise it if he or she will be absent. If a defendant has a valid reason for failing to appear, for example, if he or she has a medical emergency or is called to leave because of a family emergency, then the defendant can alert the court personally or through counsel of the problem. When, however, the defendant leaves the trial abruptly, without an explanation to either his lawyer or the court, this may be regarded as an absence without cause.

*Commonwealth v. Wilson*, 712 A.2d at 737 (internal citations omitted).

Before exercising its discretion to proceed in absentia, the trial court must weigh specific circumstances of the case such as the probability the defendant will return and the difficulty of rescheduling the trial. *Commonwealth v. Hillburn*, 746 A.2d 1146, 1150 (Pa. Super. 2000)

## B. Discussion

Upon motion, on August 15, 2016, Appellant was released from prison on nominal bail. Appellant posted bail that day, and agreed to appear at all subsequent proceedings. On August 25, 2016, the Commonwealth filed a Motion to Reconsider Release on Nominal Bond. On September 9, 2016, following a hearing, the Court denied the Commonwealth's motion to reconsider. Trial commenced on September 19, 2016. Appellant attended the first two days of trial.

44

On September 20, 2016, the second day of trial, when the Court recessed for lunch at 11:49 a.m., the Court reminded trial participants not to discuss the case with anyone. *Tr. 2, p. 89.* Proceedings resumed at 1:05 p.m. *Tr. 2, p. 89.* An initial mid-afternoon recess occurred from 2:26 p.m. to 2:42 p.m. *Tr. 2, p. 133.* The Court was apprised Appellant spoke with the media at some point during the interval between the beginning of the luncheon recess and the conclusion of the initial mid-afternoon recess. *Tr. 2, pp. 133-134.* When proceedings reconvened at 2:42 p.m., outside the presence of the jury the Court confronted Appellant about speaking with the media during the trial, and directed her to refrain from doing so. *Tr. 2, pp. 134-135.* During the exchange between the Court and Appellant, there were no outward signs there was anything wrong with Appellant; Appellant participated in the exchange; and she was responsive to the Court's inquiries. *Tr. 2, pp. 134-135.* Following the initial mid-afternoon break, the proceedings resumed without incident. At approximately 4:00 p.m., the Court recessed until 9:30 a.m. the following morning. *Tr. 2, p. 173.*

The next morning, Wednesday, September 21, 2016, Appellant failed to appear for trial by 9:30 a.m. A delay in the proceedings ensued while the Commonwealth and counsel for Appellant attempted to ascertain Appellant's whereabouts. Neither Appellant nor a representative of Appellant had advised the Court that Appellant would be delayed or absent, or provided the Court with any explanation as to Appellant's whereabouts. At 11:33 a.m., with the jury in waiting in the jury room, the Court went on the record to receive any update from counsel. The Commonwealth advised detectives had learned that, late the previous evening, Appellant had requested transport to a local hospital under an assumed name, and was subsequently admitted. Counsel for Appellant advised Appellant left a voicemail for him at the office at 7:00 a.m., which Appellant's counsel did not receive until later in the morning when

45

Counsel returned to the office during the delay in proceedings due to Appellant's absence. Counsel for Appellant had nothing further to report. *Tr. 2, pp. 3-5.*

The Court placed the following on the record:

**The Court:** Okay. Well, here's what we're going to do then. A person accused of a crime, of course, does have a constitutional right to be present at every stage of a criminal trial, that's, of course, the Sixth Amendment of the United States Constitution as well as Article 1 Section 9 of the Pennsylvania Constitution. In this instance, when she fails to attend the proceedings, she is deemed to have knowingly and voluntarily waived her right to be present. Now, the courts in this Commonwealth have consistently held that the trial court may, in its discretion, it's my discretion, conduct the trial *in absentia* when the defendant absconds without cause after the trial commences.

Now, I graciously allowed her to be released on nominal bail, that was under the assurance, her assurance – you two may be seated, by the way – that was under her assurance that she would be standing trial and submit to sentencing if she is found guilty. And unless she has been prevented from attending these proceedings for something that was beyond her control, then she's expected to be present at all stages of this trial.

Now, Ms. Calipo, the defendant, owes the Court an affirmative duty to advise whether or not she will be absent. And if she has a valid reason for failing to appear, supposing there is some medical emergency or family emergency, what she can do is alert the Court personally or through counsel of the problem. That was not done. And when she leaves this trial abruptly or fails to show on the third day without a true explanation to her lawyer or to the Court, this will be regarded as an absence without cause, so we will proceed.

. . .

The flow of this trial has already been disrupted, and if we continued this any further, an unnecessary hardship would be placed on the Court, on the jury, on the witnesses, who would be held in limbo, like the jury is being held in limbo now while we're awaiting if and when the defendant will return. So I believe we've covered our bases all well and we'll continue at this time.

*Tr. 2, pp. 5-7.*

46

When proceedings resumed on the third day of trial, the Court cautioned the jurors they should not concern themselves with the fact the defendant was not present, and should not consider her absence for any reason. *Tr. 3, p. 8.* In the final charges to the jury, the Court instructed the jurors against drawing any adverse inferences from the defendant's absence, or the fact she did not testify. *Tr. 3, p. 56.*

The Court properly exercised its discretion in continuing the trial *in absentia.* Appellant displayed manipulative behaviors during the case including the submission of multiple hybrid filings, and speaking with representatives of the media. She spoke with the media during trial after the Court reminded her not to do so. Appellant made no effort to notify the Court of the reason for her absence. The Court had no information about whether Appellant would be returning for trial, or when. The jurors had already been selected and sworn, and numerous witnesses had testified over the preceding two days of trial. It would have been impractical to have suspended proceedings further on the chance Appellant might notify her counsel or the Court of the reason for her absence, or reappear. The Court did not abuse its discretion in determining Appellant knowingly and voluntarily waived her right to be present at trial and in resuming the trial *in absentia.* Appellant's claims that error occurred in continuing with the trial in Appellant's absence on the final day of trial are wholly without merit.

## VI. Sentencing Claims

### A. Legal Standards

Appellant raises three sentencing issues concerning merger of offenses. First, Appellant claims it was error to sentence Appellant at Count Two, Arson and Related Offenses, Arson Endangering Property, on the basis Count Two should have merged with Count One, Arson and Related Offenses. Appellant asserts the statutory elements of Count Two are included in the

47

elements of Count One. *See 1925(b) Statement,* ¶17. Second, Appellant argues it was error to sentence Appellant at Count Four, Recklessly Endangering Another Person, on the basis Count Four should have merged with Count One, Arson and Related Offenses. Appellant claims the statutory elements of Count Four are included in the elements of Count One. *See 1925(b) Statement,* ¶18. Third, Appellant asserts it was error to sentence Appellant at Count Eight, Insurance Fraud (application), because Count Eight should have merged with Count Seven, Insurance Fraud (statement). Appellant claims the statutory elements of Count Seven are included in the elements of Count Eight. *See 1925(b) Statement,* ¶19.

42 Pa.C.S.A. §9765 provides as follows:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purpose, the court may sentence the defendant only on the higher graded offense.

*42 Pa.C.S.A. §9765.*

Thus, merger of offenses for sentencing purposes is appropriate only when two distinct criteria are satisfied: first, the crimes arise from a single criminal act; and second, all of the statutory elements of one of the offenses are included in the statutory elements of the other offense. *Commonwealth v. Baldwin,* 985 A.2d 830, 833 (Pa. 2009); *Commonwealth v. Kimmel,* 125 A.3d 1272, 1276 (Pa. Super. 2015); *Commonwealth v. Tanner,* 61 A.3d 1043, 1046 (Pa. Super. 2013).

The question in determining whether criminal offenses arising from a single transaction merge, is not simply whether a criminal committed one act or many; rather, the important question is whether each offense requires proof of a fact which the other does not, and if this test is satisfied, there is no merger. *Commonwealth v. Payne,* 868 A.2d 1257, 1263 (Pa. Super. 2005).

48

## B. Discussion

### 1. The two arson offenses did not merge for sentencing purposes.

Respectively, the crimes of Arson and Related Offenses, Arson Endangering Property (Count Two), 18 Pa.C.S.A. §3301(c)(3), and Arson and Related Offenses (Count One), 18 Pa.C.S.A. §3301(a)(1)(i), are defined as follows.

> §3301. Arson and related offenses
>
> ...
>
> (c) Arson endangering property.--A person commits a felony of the second degree if he intentionally starts a fire or causes an explosion, whether on his own property or that of another, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, and if:
>
> ...
>
> (3) he commits the act with intent of destroying or damaging any property, whether his own or of another, to collect insurance for such loss.

*18 Pa.C.S.A. §3301(c)(3).*

> §3301. Arson and related offenses
> (a) Arson endangering persons.--
> (1) A person commits a felony of the first degree if he intentionally starts a fire or causes an explosion, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, whether on his own property or on that of another, and if:
> (i) he thereby recklessly places another person in danger of death or bodily injury, including but not limited to a firefighter, police officer or other person actively engaged in fighting the fire;

*18 Pa.C.S.A. §3301(a)(1)(i).*

As previously set forth herein, the factual basis for Count Two, Arson and Related Offenses, Arson Endangering Property, was Appellant intentionally started a fire to destroy and/or damage her residence, to collect insurance for the loss. *See Amended Information.* Section 3301(c)(3) required the Commonwealth to prove Appellant started the fire with the intent of destroying or damaging property to collect insurance for the loss. *18 Pa.C.S.A.*

49

*§3301(c)(3)*. This is not an element of Count One, Arson and Related Offenses. *See 18 Pa.C.S.A. §3301(a)(1)(i)*.

The factual basis for Count One, Arson and Related Offenses, was the fire which Appellant intentionally started at her residence recklessly placed responding firefighters, police or others actively engaged in fighting the fire in danger of death or bodily injury. *See Amended Information.* Section 3301(a)(1)(i) required the Commonwealth to prove Appellant recklessly placed another person in danger of death or bodily injury, including but not limited to a firefighter, police officer or other person actively engaged in fighting the fire. *18 Pa.C.S.A. §3301(a)(1)(i).* This is not an element of Count Two, Arson and Related Offenses, Arson Endangering Property. *See 18 Pa.C.S.A. §3301(c)(3).*

Each arson offense required proof of facts which the other did not. Therefore, the offenses do not merge. *See Commonwealth v. Payne,* 868 A.2d 1257, 1263 (Pa. Super. 2005). Further, though there was only one act, the setting of one fire, the two counts of arson protect distinctly different interests of the Commonwealth. The offense at Count One, Arson and Related Offenses, concerns the protection of persons. The offense at Count Two, Arson and Related Offenses, Arson Endangering Property, protects against insurance fraud. Thus, there was no merger of the offenses for sentencing purposes. *See Commonwealth v. Colpo,* 532 A.2d 870, 873 (Pa. Super. 1987).

**2. Recklessly Endangering Another Person (Count Four) and Arson and Related Offenses (Count One) did not merge for sentencing purposes.**

The crimes of Recklessly Endangering Another Person (Count Four), 18 Pa.C.S.A. §2705, and Arson and Related Offenses (Count One), 18 Pa.C.S.A. §3301(a)(1)(i), are defined as follows.

50

A person commits the crime of Recklessly Endangering Another Person, Count Four, misdemeanor of the second degree, "if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." *18 Pa.C.S.A. §2705.*

Count One, Arson and Related Offenses, is defined as follows:

**§3301. Arson and related offenses**
**(a) Arson endangering persons.--**
(1) A person commits a felony of the first degree if he intentionally starts a fire or causes an explosion, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, whether on his own property or on that of another, and if:
(i) he thereby recklessly places another person in danger of death or bodily injury, including but not limited to a firefighter, police officer or other person actively engaged in fighting the fire;

*18 Pa.C.S.A. §3301(a)(1)(i).*

The factual basis for the charge of Recklessly Endangering Another Person at Count Four was that Appellant's reckless conduct placed occupants in neighboring houses in danger of death or serious bodily injury. *See Amended Information.* Thus, 18 Pa.C.S.A. §2705, as charged, pertained to the occupants of neighboring houses, and required the Commonwealth to prove Appellant's reckless conduct placed that specific group of persons in danger of death or serious bodily injury. *See 18 Pa.C.S.A. §2705.* This was not an element of Arson and Related Offenses at 18 Pa.C.S.A. §3301(a)(1)(i).

The factual basis for Count One, Arson and Related Offenses, was the fire which Appellant intentionally started at her residence recklessly placed responding firefighters, police or others actively engaged in fighting the fire in danger of death or bodily injury. *See Amended Information.* Section 3301(a)(1)(i) required the Commonwealth to prove Appellant recklessly placed another person in danger of death or bodily injury, including but not limited to a firefighter, police officer or other person actively engaged in fighting the fire. *18 Pa.C.S.A.*

51

*§3301(a)(1)(i)*. This was not an element of the offense as charged at REAP, Count Four, whose focus was the occupants of neighboring houses. *See 18 Pa.C.S.A. §2705.*

Since the offense at Count Four, Recklessly Endangering Another Person, and the offense at Count One, Arson and Related Offenses, required proof of facts which the other did not, the two offenses do not merge. *See Commonwealth v. Payne,* 868 A.2d 1257, 1263 (Pa. Super. 2005). The offenses as charged were distinct and separate. It was entirely possible the Commonwealth could have met its burden of proof as to REAP at Count Four (concerning occupants of neighboring houses), but not as to arson at Count One (concerning responding public safety personnel), or vice versa.

Moreover, it is apparent charges were aimed at the protection of distinctly different Commonwealth interests. REAP at Count Four concerned protection of occupants of neighboring houses. Count One, Arson and Related Offenses at 18 Pa.C.S.A. §3301(a)(1)(i), concerned the protection of responding firefighters, police or others actively engaged in fighting the fire. There was no merger of these two offenses for sentencing purposes. *See Commonwealth v. Colpo,* 532 A.2d 870, 873 (Pa. Super. 1987). Pennsylvania courts have recognized REAP is an offense defined "with respect to an individual person being placed in danger of death or serious bodily injury, and that a separate offense is committed for each individual person placed in such danger." *Commonwealth v. Glass,* 50 A.3d 720, 731 (Pa. Super. 2012), citing *Commonwealth v. Frisbie,* 485 A.2d 1098, 1100 (Pa. 1984). Each of the REAP convictions at Counts Four through Six concerned different classes of individuals. Separate offenses were committed for each class of person placed in such danger. *See Commonwealth v. Glass,* 50 A.3d at 731.

52

At sentencing, the Court recognized Appellant's two other convictions for REAP (Count Five-responding firefighters and Count Six-responding police officers), merged with the arson conviction at Count One (responding firefighters, police or others actively engaged in fighting the fire). However, since the Commonwealth's burden of proof in establishing REAP at Count Four (occupants of neighboring houses), was completely different than its burden in establishing Arson at Count One (risk to public safety personnel), no error occurred in sentencing Appellant at Count Four, Recklessly Endangering Another Person,

### 3. The two insurance fraud offenses did not merge for sentencing purposes.

The crime of Insurance Fraud, 18 Pa.C.S.A. §4117(b)(4), charged at Count Eight (application), is defined as follows:

> A person may not knowingly and with intent to defraud any insurance company, self-insured or other person file *an application for insurance* containing any false information or conceal for the purpose of misleading information concerning any fact material thereto.

*18 Pa.C.S.A. §4117(b)(4)(emphasis added).*

The crime of Insurance Fraud, 18 Pa.C.S.A. §4117(a)(2), charged at Count Seven (statement) is defined as follows. A person commits insurance fraud if he or she

> "[k]nowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured *any statement forming a part of, or in support of, a claim* that contains any false, incomplete or misleading information concerning any fact or thing material to the claim."

*18 Pa.C.S.A. §4117(a)(2)(emphasis added).*

The factual basis for the charge of Insurance Fraud (Count Eight) is Appellant knowingly and with the intent to defraud Allstate Insurance Company, *filed a fraudulent or misleading application for insurance. See Amended Information.* In establishing the elements of this offense, the Commonwealth was required to prove Appellant filed a fraudulent or misleading

53

insurance application. This is not an element of the offense of Insurance Fraud (statement), Count Seven, 18 Pa.C.S.A. §4117(a)(2). *See 18 Pa.C.S.A. §4117(a)(2)*.

The factual basis for the charge of Insurance Fraud (Count Seven) is Appellant knowingly and with the intent to defraud Allstate, submitted claims for loss of personal property and real estate which contained false, incomplete or misleading information. *See Amended Information*. This is not an element of Insurance Fraud (Count Eight), 18 Pa.C.S.A. §4117(b)(4). *See 18 Pa.C.S.A. §4117(b)(4)*.

Since each arson offense required proof of facts which the other did not, the offenses do not merge. *See Commonwealth v. Payne*, 868 A.2d 1257, 1263 (Pa. Super. 2005).

Further, the arson crimes arose from separate and distinct acts. Count Eight arose from Appellant's false and misleading statements in applying for homeowner's insurance in November, 2014. Count Seven arose from Appellant's fraudulent claim for loss of real estate and contents after the February of 2015 fire. The crimes do not merge for sentencing purposes.

Appellant's sentencing claims are wholly without merit, and must be dismissed.

54

## CONCLUSION

For the above reasons, the judgment of sentence should be affirmed. The Clerk of Courts is hereby directed to transmit the record to the Superior Court.

BY THE COURT:

_4/13/2015_
**Date**

_Daniel J. Brabender_
Daniel J. Brabender, Jr., Judge

cc:   Elizabeth A. Hirz, Esq., District Attorney's Office
Michael W. Harmon, Esq., 305 West Sixth Street, Erie, PA 16507
Julia Ann Calipo, County Inmate No. 16449, Pod "A", Erie County Prison, 1618 Ash Street, Erie, PA 16503  LEGAL MAIL